United States District Court
Northern District of California

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| CLAUDE BENT,<br><br>        Plaintiff,<br><br>    v.<br><br>WILLIAM P. BARR, et al.,<br><br>        Defendants. | Case No. 19-cv-06123-DMR<br><br>**ORDER ON PETITIONER'S SECOND MOTION FOR TEMPORARY RESTRAINING ORDER** |

Petitioner Claude Bent is a foreign national detained in Mesa Verde ICE Processing Facility ("Mesa Verde"), which is located in Kern County, California. Before the court is Bent's motion for a temporary restraining order ("TRO") seeking immediate release from detention because of the COVID-19 pandemic. [Docket Nos. 20 ("Mot."), 23 ("Reply").] Respondents oppose. [Docket No. 22 ("Opp.").] For the reasons stated below, the petition is conditionally granted.

**I.    BACKGROUND**

    **A.    COVID-19 Pandemic**

COVID-19, the disease caused by the novel coronavirus, is an emerging global health crisis. The first cases of COVID-19 were identified in the United States in late January 2020.[1] On March 4, 2019, California declared a state of emergency in response to COVID-19.[2] The World Health Organization classified COVID-19 as a global pandemic on March 11, 2020.[3] On March 13, 2019,

---

[1] Ctrs. for Disease Control & Prevention, *First Travel-related Case of 2019 Novel Coronavirus Detected in the United States* (Jan. 21, 2020), https://www.nytimes.com/interactive/2020/us/coronavirus-us-cases.html.

[2] Exec. Dep't, State of California, "Proclamation of a State of Emergency" (Mar. 4, 2020), *available at* https://www.gov.ca.gov/wp-content/uploads/2020/03/3.4.20-Coronavirus-SOE-Proclamation.pdf.

[3] *See* World Health Organization, *WHO Director-General's opening remarks at the media briefing on COVID-19- 11 March 2020*, https://www.who.int/dg/speeches/detail/who-director-general-s-

President Donald J. Trump declared a national emergency.[4] Kern County, where Mesa Verde is located, declared a local state of emergency on March 16, 2020.[5] On March 19, 2020, California Governor Gavin Newsom issued a "shelter-in-place" order, directing individuals to stay at home except to conduct essential activities.[6]

COVID-19 is largely spread through person-to-person contact via respiratory droplets from an infected person.[7] The virus spreads "very easily and sustainably between people," and can be spread by people who are asymptomatic, and from contact with contaminated surfaces.[8] Current studies predict that, depending on the material, the virus can survive on untreated surfaces for between three hours to three days.[9] People with certain underlying health conditions and the elderly are known to be particularly at risk for medical complications related to the disease.[10]

Information on this pandemic is rapidly evolving and there is currently no vaccine to prevent

---

opening-remarks-at-the-media-briefing-on-covid-19---11-march-2020 (last visited Apr. 3, 2020 at 6:00 PM).

[4] The White House, *Proclamation on Declaring a National Emergency Concerning the Novel Coronavirus Disease (COVID-19) Outbreak* (Mar. 13, 2020), *available at* https://www.whitehouse.gov/presidential-actions/proclamation-declaring-national-emergency-concerning-novel-coronavirus-disease-covid-19-outbreak/.

[5] Robert Price, *UPDATE: County of Kern announces local state of emergency due to coronavirus*, KGET.com (last updated Mar. 17, 2020), https://www.kget.com/health/coronavirus/kern-county-officials-likely-to-recommend-countywide-state-of-emergency/.

[6] Exec. Dep't, State of California, Executive Order N-33-20 (Mar. 19, 2020), *available at* https://covid19.ca.gov/img/Executive-Order-N-33-20.pdf.

[7] Ctrs. For Disease Control & Prevention, *How COVID-19 Spreads, Center for Disease Control and Prevention*, (last updated Apr. 2, 2020), https://www.cdc.gov/coronavirus/2019-ncov/prevent-getting-sick/how-covid-spreads.html.

[8] *Id.*

[9] *See* Nat'l Institutes of Health, *New coronavirus stable for hours on surfaces* (Mar. 17, 2020), https://www.nih.gov/news-events/news-releases/new-coronavirus-stable-hours-surfaces ("The scientists found that severe acute respiratory syndrome coronavirus 2 (SARS-CoV-2) was detectable in aerosols for up to three hours, up to four hours on copper, up to 24 hours on cardboard and up to two to three days on plastic and stainless steel.").

[10] *See* Ctrs. for Disease Control & Prevention, *People Who Need to Take Extra Precautions* (last updated Mar. 20, 2020), https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/index.html.

further infections.[11] Presently, virus control efforts focus on "social distancing." The Center for Disease Control ("CDC") recommends that individuals stay six feet away from each other at all times.[12] The CDC also recommends regularly disinfecting "high touch" surfaces such as tables, doorknobs, light switches, and sinks.[13] On April 3, 2020, the CDC recommended that people use cloth face masks in public to help slow the spread of the virus.[14]

### B. Case Background

Bent was born in Jamaica and is 58 years old. Petition ¶ 6. He came to the United States as a lawful permanent resident at age 18. *Id.* In 2006, Bent was convicted of voluntary manslaughter and attempted murder in California state court. Bent was sentenced to just over thirteen years for both offenses. *Id.* ¶ 14. Upon serving his term of imprisonment, Bent was immediately detained by ICE. *Id.* He has been in ICE custody since July 2016.

On July 20, 2016, the DHS commenced removal proceedings, asserting that Bent's attempted murder conviction constituted an aggravated felony as defined under 8 U.S.C. §§ 1101(a)(43)(A), (U), and therefore subjected him to deportation. Petition ¶ 15. *See* 8 U.S.C. § 1226(c)(1)(B) (stating that noncitizens convicted of an aggravated felony are deportable). Bent's removal case is ongoing and has involved appeals to and remands from the BIA and Ninth Circuit. On March 27, 2020, Bent filed the current motion for a temporary restraining order, seeking immediate release from detention due to the COVID-19 pandemic. He represents that he faces particular risk from the virus due to his age and underlying health conditions. *See* Docket No. 20-2, Declaration of Claude Bent ("Bent Decl."). Specifically, Bent suffers from asthma, hypertension, and prediabetes. *Id.* ¶ 4. He uses two inhalers for his asthma: a steroid inhaler that he uses twice a

---

[11] *See* Ctrs. for Disease Control & Prevention, *How to Protect Yourself & Others* (last visited Apr. 6, 2020), https://www.cdc.gov/coronavirus/2019-ncov/prevent-getting-sick/prevention.html.

[12] *See id.* ("The best way to prevent illness is to avoid being exposed to this virus.").

[13] *See* Ctrs. for Disease Control & Prevention, *Cleaning Your Home* (last updated Apr. 2, 2020), https://www.cdc.gov/coronavirus/2019-ncov/prevent-getting-sick/disinfecting-your-home.html

[14] *See* Ctrs. for Disease Control & Prevention, *Recommendations Regarding the Use of Cloth Face Coverings, Especially in Areas of Significant Community-Based Transmission*, https://www.cdc.gov/coronavirus/2019-ncov/prevent-getting-sick/cloth-face-cover.html.

3

day and a smaller inhaler that he uses for emergencies. *Id.* ¶ 5. He asserts that Mesa Verde does not adequately protect him from the risk of contracting COVID-19 due to overcrowding and lack of adequate cleaning supplies. *Id.* ¶¶ 8-11.

## II. DISCUSSION

The government argues that Bent may not challenge the conditions of his confinement through a habeas petition seeking immediate release; that he lacks standing; and that he has failed to show that he is entitled to a temporary restraining order.

### A. Habeas Relief

A district court has authority to grant a writ of habeas corpus where an individual is "in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2241(c)(3). Bent brings claims under the Fifth Amendment of the U.S. Constitution and asserts he is therefore entitled to seek relief through a habeas petition. Respondents argue that "[a] petition for habeas relief seeking immediate release is inappropriate in the context of a conditions-of-confinement claim." Opp. at 11 (citing *Crawford v. Bell*, 599 F.2d 890, 891 (9th Cir. 1979)). Although Respondents are correct that "prisoners may not challenge *mere* conditions of confinement in habeas corpus," *Nettles v. Grounds*, 830 F.3d 922, 933 (9th Cir. 2016) (en banc) (emphasis added), "[c]hallenges to the validity of any confinement or to particulars affecting its duration are the province of habeas corpus." *Muhammad v. Close*, 540 U.S. 749, 750 (2004). In this case, Bent does not solely challenge the conditions of his confinement. He contests that his continued detention during the COVID-19 pandemic violates his substantive due process rights. This is patently a "challenge[] to the validity" of his confinement. *See Muhammad*, 540 U.S. at 750. At least three judges in the Ninth Circuit, including one within this district, have entertained similar claims under habeas jurisdiction. *Ortuño v. Jennings*, Case. No. 20-cv-2064-MMC, Docket No. 38 (N.D. Cal. Apr. 8, 2020) (ordering release of certain immigration detainees due to the COVID-19 pandemic); *Castillo v. Barr*, 2020 WL 1502864 (C.D. Cal. Mar. 27, 2020) (same); *Zhang v. Barr*, 2020 WL 1502607, at *9 (C.D. Cal. Mar. 27, 2020) (finding habeas corpus jurisdiction to order an expedited bond hearing). The Ninth Circuit *sua sponte* ordered the immediate release of an immigration detainee with a pending petition for review of her removal order "[i]n light of the rapidly escalating

4

public health crisis, which public health authorities predict will especially impact immigration detention centers." *Xochihua-Jaimes v. Barr*, No. 18-cv-71460, 2020 WL 1429877, at *1 (9th Cir. Mar. 24, 2020). To the extent that Respondents claim Bent is absolutely prohibited from seeking release because he is mandatorily detained under 18 U.S.C. § 1226(c), the court has already rejected that argument. *See* Docket No. 24, at 12; *see also Basank v. Decker*, 2020 WL 1481503, at *6 (S.D.N.Y. Mar. 26, 2020) ("[C]ourts have the authority to order those detained in violation of their due process rights released, notwithstanding § 1226(c).").

As Bent challenges his continued detention under the due process clause of the Fifth Amendment, the court has habeas corpus jurisdiction over the claims related to his detention.

### B. Standing

The "irreducible constitutional minimum of standing" requires a petitioner to show an (1) injury-in-fact that is "concrete and particularized" and "actual or imminent, not conjectural or hypothetical"; (2) a "causal connection between the injury and the conduct complained of"; and (3) "it must be likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992) (internal quotation marks and citations omitted). Respondents argue that Bent lacks standing to pursue his requested relief because he cannot show an actual or imminent injury or a likelihood that the injury will be redressable by release. They claim that COVID-19 has not yet spread to Mesa Verde, so Bent's injury is only conjectural and the assumption that he is safer if he is released is speculative. *Id.* at 9-11.

Courts fielding habeas petitions in the wake of the escalating pandemic have rejected similar standing arguments, even when there is no evidence that a particular detention facility has detected a confirmed case of the virus. *See e.g.*, *Castillo*, 2020 WL 1502864, at *4; *Thakker v. Doll*, 2020 WL 1671536, at *2 (M.D. Penn. March 31, 2020). A court in this district has specifically found standing with respect to petitioners who are detained in Mesa Verde. *Ortuño*, Case. No. 20-cv-2064-MMC, Docket No. 38 at 3. Most of these cases rely on *Helling v. McKinney*, where the Supreme Court observed that "it would be odd to deny an injunction to inmates who plainly proved an unsafe, life-threatening condition in their prison on the ground that nothing yet had happened to

5

them." 509 U.S. 25, 333 (1993). It is unquestionable that COVID-19 is spreading through ICE detention facilities despite Respondents' precautions. As of April 9, 2020, there are confirmed cases of COVID-19 in ICE detention facilities in California, New Jersey, Georgia, Arizona, Pennsylvania, Louisiana, Michigan, Florida, Ohio, Colorado, and Texas.[15] Kern County, where Mesa Verde is located, reports 306 confirmed cases of COVID-19 in the community and 2 deaths.[16] "[A] remedy for unsafe conditions need not await a tragic event." *Helling*, 509 U.S. at 33. Given the exponential spread of the virus, the ability of COVID-19 to spread through asymptomatic individuals, and the inevitable delays of court proceedings, effective relief for Bent and other detainees may not be possible if they are forced to wait until their particular facility records a confirmed case. *United States v. Kennedy*, 2020 WL 1493481, at *5 (E.D. Mich. Mar. 27, 2020) ("[W]aiting for either Defendant to have a confirmed case of COVID-19, or for there to be a major outbreak in Defendant's facility, would render meaningless this request for release."); *see also Thakker*, 2020 WL 1671563, at *2 ("Respondents would have us offer no substantial relief to Petitioners until the pandemic erupts in our prisons. We reject this notion."). Accordingly, Bent and other ICE detainees face an imminent injury that is neither conjectural nor hypothetical.

With respect to the redressability of Bent's asserted harm, courts have recognized that "[t]he nature of detention facilities makes exposure and spread of the virus particularly harmful." *Basank v. Decker*, 2020 WL 1481503, at *3 (S.D.N.Y. Mar. 26, 2020); *see also Castillo*, 2020 WL 1502864, at *5 ("[T]he Government cannot deny the fact that the risk of infection in immigration detention facilities – and jails – is particularly high if an asymptomatic guard, or other employee, enters a facility."); *Coreas v. Bounds*, 2020 WL 1663133, at *6 (D. Md. Apr. 3, 2020) (relying on expert opinions to conclude that it was implausible to claim "someone will be safer from a contagious disease while confined in close quarters with dozens of other detainees and staff than while at liberty"). Bent also submitted numerous expert letters and declarations attesting to the danger of

---

[15] U.S. Immigration & Customs Enforcement, *ICE Guidance on COVID-19*, https://www.ice.gov/coronavirus (follow "Confirmed Cases" link) (last visited April 9, 2020).

[16] Kern Cnty. Pub. Health Servs. Dep't, *Coronavirus Disease 2019 (COVID-19)*, https://kernpublichealth.com/2019-novel-coronavirus (last visited April 9, 2020).

outbreaks in detention facilities. *See, e.g.*, Docket Nos. 20-4, Expert Letter by Dr. Carlos Franco-Paredes ("Franco-Paredes Letter"), at 2 ("Detention of any kind allows for large groups of people to be held together in a confined space and creates the worst type of setting for curbing the spread of a highly contagious infection such as COVID-19."); 23-4, Declaration of Dr. Robert B. Greifinger ("Greifinger Decl.") ¶ 15 ("Immigration detention facilities have even greater risk of infectious spread because of conditions of crowding, the proportion of vulnerable people detained, the lack of ventilation, and often scant medical care resources."); 23-5, Declaration of Dr. Ranit Mishori ("Mishori Decl.") ¶ 16 ("The risk posed by infectious diseases in immigration detention facilities, including jails and prisons, is significantly higher than in the community, both in terms of risk of exposure and transmission and harm to individuals who become infected."); 23-7, Declaration of Dr. Allen S. Keller ("Keller Decl.") ¶ 5 ("It is my professional opinion that in the midst of the COVID-19 pandemic the conditions of confinement in immigration detention facilities are unsafe and pose a danger to detained immigrants."). Although Respondents point out that Mesa Verde does not currently have any confirmed COVID-19 cases, they do not dispute that there are particular risks associated with outbreaks within detention facilities. For the reasons explained above, the risks to Mesa Verde detainees are imminent despite the current lack of confirmed cases in the facility. Therefore, Bent's assertion that his risk of injury would be reduced by release is not speculative.

The court finds that Bent has asserted standing to pursue his claims.

### C. Entitlement to TRO

The legal standard governing TROs is "substantially identical" to that governing preliminary injunctions. *Stuhlbarg Int'l Sales Co. v. John D. Brush & Co.*, 240 F.3d 832, 839 n. 7 (9th Cir. 2001). A petitioner seeking either form of injunctive relief must establish "that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Winter v. Natural Resources Defense Council, Inc.*, 555 U.S. 7, 20 (2008). The Ninth Circuit uses a sliding scale approach to preliminary injunctions, such that "a stronger showing of one element may offset a weaker showing of another." *All. for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1131 (9th Cir.

2011); *see also Pimentel v. Dreyfus*, 670 F.3d 1096, 1105 (9th Cir. 2012). Under the sliding scale approach, a petitioner is entitled to a TRO if he has raised "serious questions going to the merits . . . and the balance of hardships tips sharply in [his] favor." *All. for the Wild Rockies*, 632 F.3d at 1131 (quoting *Clear Channel Outdoor, Inc. v. City of Los Angeles*, 340 F.3d 810, 813 (9th Cir. 2003)).

### 1. Serious Questions Raised

The Constitution imposes an obligation on the government to provide for the "safety and general wellbeing" of those it holds in custody. *DeShaney v. Winnebago Cty. Dep't of Soc. Servs.*, 489 U.S. 189, 199-200 (1989). For individuals who have been convicted of a crime, this duty arises under the Eighth Amendment and is violated upon a showing of "deliberate indifference to [the] serious medical needs of prisoners." *Estelle v. Gamble*, 429 U.S. 97, 103-04 (1976). By contrast, immigration detention is civil confinement, even where a detainee has a prior criminal conviction. *Zadvydas v. Davis*, 533 U.S. 678, 690 (2001). The government's duty to oversee the welfare of federal civil detainees, such as Bent, arises under the due process clause of the Fifth Amendment. *Demore v. Kim*, 538 U.S. 510, 523 (2003); *Youngberg v. Romeo*, 457 U.S. 307, 315-16 (1982). The Fifth Amendment requires that civil detainees "cannot be subjected to conditions that 'amount to punishment.'" *Jones v. Blanas*, 393 F.3d 918, 932 (9th Cir. 2004) (quoting *Bell v. Wolfish*, 441 U.S. 520, 535 (1979)). Accordingly, "civilly detained persons must be afforded more considerate treatment and conditions of confinement than criminals whose conditions of confinement are designed to punish." *Padilla v. Yoo*, 678 F.3d 748, 759 (9th Cir. 2012) (internal quotation marks and citations omitted). "In the absence of evidence of express intent, a court may infer that the purpose of a particular restriction or condition is punishment if the restriction or condition is not reasonably related to a legitimate governmental objective or is excessive in relation to the legitimate governmental objective." *Unknown Parties v. Johnson*, 2016 WL 8188563, at *5 (D. Ariz. Nov. 18, 2016), *aff'd sub nom. Doe v. Kelly*, 878 F.3d 710 (9th Cir. 2017).

In *Dawson v. Asher*, several petitioners filed a TRO seeking release from immigration detention during the COVID-19 pandemic. 2020 WL 1304557 (W.D. Wash. Mar. 19, 2020). The petitioners, like Bent in this case, argued that continued detention violated their substantive due

process rights under the Fifth Amendment due to their conditions of confinement and heightened health risk. The court disagreed, finding that the petitioners had not demonstrated a likelihood of success on the merits of their claim. *Id.* at *2. The court noted that the government has a legitimate interest in ensuring detainees appear for removal proceedings and found that the petitioner's "current confinement does not appear excessive in relation to that objective." *Id.* It stated that it was unaware of authority "under which the fact of detention itself becomes an 'excessive' condition solely due to the risk of a communicable disease outbreak—even one as serious as COVID-19." *Id.* The court observed that there was no evidence of an outbreak in the detention facility and that the government was taking steps to prevent one. *Id.* The court accordingly denied the TRO.

Subsequent courts have reached the opposite conclusion. In *Basank*, the government respondents represented that they were taking measures to prevent the spread of COVID-19 in the petitioners' respective detention facilities, including "screening detainees upon intake for risk factors, isolating detainees who report symptoms, conducting video court appearances with only one detainee in the room at a time, providing soap and hand sanitizer to inmates, and increasing the frequency and intensity of cleaning jail facilities." 2020 WL 1481503, at *5. The court found that the listed measures were "patently insufficient" to protect detainees. *Id.* It observed that the government made no representation that the detainees could remain six feet apart from one another, as recommended by the CDC, and did not identify any measures the facilities were taking to protect detainees at higher risk of serious complications or death. *Id.* *Basank* acknowledged the government's representation that the detention facilities were "below their full capacity," but observed that "the appropriate capacity of a jail during a pandemic obviously differs enormously from its appropriate capacity under ordinary circumstances." *Id.* *6. The court therefore determined that the detainees had shown they were likely to succeed on the merits of their due process claim. Similarly, *Castillo* found that the detainees had not been adequately protected because they were "not kept at least 6 feet apart from others at all times" and "have been put into a situation where they are forced to touch surfaces touched by other detainees, such as with common sinks, toilets and showers." 2020 WL 1502864, at *5. The court in *Thakker* observed that "[s]ocial distancing and proper hygiene are the *only* effective means by which we can stop the spread of COVID-19" and

9

that detainees could not effectively practices those preventative measures in the detention facilities at issue in that case. *Thakker*, Case No. 20-cv-480, Docket No. 47, at 21. In *Ortuño*, Judge Chesney found that detainees in Mesa Verde are "kept in close proximity" and "cannot practice meaningful social distancing." Case. No. 20-cv-2064-MMC, Docket No. 38 at 6.

Notably, the preventative measures examined in *Basank* are nearly identical to those listed by Respondents in this case. *See* Docket No. 22-1, Declaration of Jennifer Moon ("Moon Decl.") ¶¶ 8-20. Bent asserts that the identified preventative measures have not actually been implemented. He claims that guards in his facility have refused to give the detainees hand sanitizer, liquid soap, or bleach, and that the dormitories are cleaned by the detainees. Bent Decl. ¶¶ 9-10; Docket No. 23-2, Second Declaration of Claude Bent ("Second Bent Decl.") ¶ 5. Respondents do not dispute these assertions; they state only that Mesa Verde has "increased sanitation frequency and provide[s] sanitation supplies," but notably do not specify whether and to what extent detainees have access to these supplies. *See* Moon Decl. ¶ 15. Bent also represents that a staff member took the temperature of another detainee by rubbing a small machine against his forehead, and that she then took Bent's temperature with the same machine without wiping it off. Second Bent Decl. ¶ 4. Attorney Kathleen Kavanagh, who represents a different detainee, asserts that her client was recently transferred to Mesa Verde and was not placed in isolation upon arriving at the facility. [Docket No. 20-5, Declaration of Kathleen Kavanagh ("Kavanagh Decl.") ¶¶ 3-4.]

Regardless, even assuming that Respondents accurately describe Mesa Verde's current practices, these practices are inadequate to ensure the "safety and general wellbeing" of Mesa Verde detainees during the COVID-19 pandemic. *See DeShaney*, 489 U.S. at 199-200. Respondents admit that Mesa Verde currently houses 312 detainees out of its capacity of 400. [Docket No. 22-2, Declaration of Erik Bonnar ("Bonnar Decl.") ¶ 7.] This number includes 252 male detainees divided among three dormitory units, which means approximately 84 individuals housed in each male dormitory. *See id.* Although Respondents represent that they are following CDC guidelines, they make no representations that they have attempted to implement CDC recommendations on social distancing in detention facilities, including by staggering meal and recreation times, rearranging bunks and dining hall seating, or minimizing the mixing of individuals from different housing

units.[17] *See Basank*, 2020 WL 1481503, at *5 (finding that immigration detainees were not adequately protected where the CDC's social distancing recommendations could not be implemented); Keller Decl. ¶ 8 (stating that the CDC's social distancing guidelines "cannot be effectively and safely implemented in immigration detention"). Respondents also identify no practices intended to address the heightened risks facing elderly people or those with underlying health conditions. *See Coronel v. Decker*, 2020 WL 1487274, at *5 (S.D.N.Y. Mar. 27, 2020) (finding that ICE's containment efforts were inadequate where it took no "specific action to prevent the spread of COVID-19 to high-risk individuals," such as isolation or "special safety or hygiene protocols"). While Respondents assert that staff and vendors are "screened" upon entry into Mesa Verde, the screening appears to be limited to screening for fevers. *See* Moon Decl. ¶ 17. They do not represent that staff or vendors use protective equipment such as masks to prevent spreading COVID-19 or that any of the staff or detainees have been tested for the virus. Considering that the virus can be spread by people who are asymptomatic, Mesa Verde's practice of screening staff for fevers is of limited benefit. *See* Mishori Decl. ¶ 17 ("[S]taff arrive and leave on a shift basis; there is no ability to adequately screen staff for new, asymptomatic infection."). In short, public health experts make clear that an outbreak in confined spaces is potentially devastating. Respondents have not shown that they have implemented or can implement the minimum recommended preventative measures.

Against the backdrop of this escalating public health crisis, the increased risks posed by detention, and Bent's particular vulnerability, the court holds that Bent has at least raised serious questions that his continued detention in Mesa Verde during the COVID-19 poses risks that are excessive in relation to the government's legitimate objectives. *See Ortuño*, Case. No. 20-cv-2064-MMC, Docket No. 38 at 7 (coming to the same conclusion with respect to a detainee at Mesa Verde who, like Bent, suffers from asthma). Consistent with the Ninth Circuit's sliding scale approach to granting injunctive relief, the court next weighs whether the "balance of hardships tip[] sharply in [his] favor." *See All. for the Wild Rockies*, 632 F.3d at 1131 (citation omitted).

---

[17] Ctrs. for Disease Control & Prevention, *Interim Guidance on Management of Coronavirus Disease 2019 (COVID-19) in Correctional and Detention Facilities* (Mar. 23, 2020), https://www.cdc.gov/coronavirus/2019-ncov/downloads/guidance-correctional-detention.pdf.

11

## 2. Irreparable Harm

A petitioner seeking an injunction must demonstrate that irreparable injury is likely in the absence of such relief. *Winter*, 555 U.S. at 22. The threat of unconstitutional detention on its own constitutes an irreparable injury. *See Hernandez v. Sessions*, 872 F.3d 976, 994 (2017). Since Bent has raised serious questions that his continued confinement violates his substantive due process rights, he has also shown irreparable harm. *See id.* Moreover, in addressing Respondents' standing argument above, the court explained the nature and severity of the imminent harm facing aging detainees and people with certain underlying health conditions. Bent is 58 years old and suffers from asthma, hypertension, and prediabetes. *See* Docket No. 20-3, Medical Record ("M.R.") at 44 (noting high blood pressure and asthma/respiratory issues); 126 (listing asthma, hypertension, and hyperlipidemia); 109, 112, 117 (indicating prediabetes). His asthma requires treatment by steroids through a QVAR inhaler, an albuterol inhaler, and multiple allergy medications. M.R. at 55, 60, 76, 84. He has also been prescribed medication for high blood pressure and high cholesterol. M.R. at 56-63, 88. Bent has taken metformin, a diabetes medication, since at least February 2019. M.R. at 104. In April, August, and October 2019, Bent's laboratory results showed hemoglobin A1c levels at 6.4%, indicating prediabetes. M.R. 109, 112, 117. The medical notes state that prediabetes hemoglobin levels range from 5.7-6.4%, while higher levels indicate diabetes. M.R. 109, 112, 117; *see also* M.R. 107. Therefore, Bent's results indicate levels that are borderline for diabetes. The CDC has advised that people with hypertension, diabetes, and moderate to severe asthma are at increased risk for severe illness from COVID-19.[18] Although there are not yet specific CDC findings with respect to prediabetes, Bent's laboratory results may indicate similar risk concerns. In any case, Bent has at least two high-risk conditions and has therefore established that he is at heightened risk because of COVID-19. Thus, Bent has shown the likelihood of irreparable injury to his health and safety. *See Coronel*, 2020 WL 1487274, at *3 ("Due to their serious underlying

---

[18] Ctrs. for Disease Control & Prevention, *Groups at Higher Risk for Severe Illness* (last updated Apr. 2, 2020), https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/groups-at-higher-risk.html; Ctrs. for Disease Control & Prevention, *Interim Clinical Guidance for Management of Patients with Confirmed Coronavirus Disease* (last updated Apr. 3, 2020), https://www.cdc.gov/coronavirus/2019-ncov/hcp/clinical-guidance-management-patients.html.

medical conditions, all Petitioners face a risk of severe, irreparable harm if they contract COVID-19."); *see also Castillo*, 2020 WL 1502865, at *6 (same); *Ortuño*, Case. No. 20-cv-2064-MMC, Docket No. 38 at 8 (finding that the petitioners, "as persons at high risk of severe illness or death if infected with COVID-19, are likely to incur irreparable injury in the absence of any relief from their present conditions of confinement").

### 3. Balance of Equities and Public Interest

"Where the Government is the opposing party, the final two factors in the temporary restraining order analysis—the balance of the equities and the public interest—merge." *Coronel*, 2020 WL 1487274, at *7. Respondents assert that the "public and governmental interest in [Bent's] continued detention pending his removal proceedings is significant," given his "extensive and undisputed criminal history." Opp. at 17. They point out that Bent has previously been found by an IJ to be a flight risk and a danger to society. *See* Opp. at 1.

The court acknowledges that the government and the public have an interest in ensuring Bent's appearance at future removal proceedings as well as preventing danger to the community. However, courts have recognized the shifting nature of these interests in light of the COVID-19 pandemic. With respect to potential flight risk, *Castillo* noted that "[t]he risk that Petitioners . . . will flee, given the current global pandemic is very low, and reasonable conditions can be fashioned to ensure their future appearance at deportation proceedings." 2020 WL 1502864. Other courts have recognized that any risk a detainee poses to the community "requires considering all factors," including the "substantial medical and security challenges [that] would almost certainly arise" in the event of a COVID-19 outbreak in a prison or detention facility. *United States v. Stephens*, 2020 WL 1295155, at *2; *see also United States v. Martin*, 2020 WL 1274857, at *2 (D. Md. Mar. 17, 2020) (recognizing that the health risk of COVID-19 constitutes new information "having a material bearing on whether there are conditions of release that will reasonably assure the appearance of detained defendants and secure the safety of the community"). For example, Dr. Mishori testifies that an outbreak in a detention facility may strain the resources of regional hospitals and health centers, and "reduc[e] the number of hospitals beds and equipment available for the general population." Mishori Decl. ¶ 38. Given that additional burdens on the health system in this crisis

13

may lead to a greater number of deaths among the public, public health considerations cannot be ignored in assessing an individual's risk to the community.

Courts have found a significant public interest in releasing ill and aging detainees and have accordingly ordered immediate release. *See, e.g.*, *Ortuño*, Case. No. 20-cv-2064-MMC, Docket No. 38 at 8 (finding that "the public interest in promoting public health is served by efforts to contain the further spread of COVID-19, particularly in detention centers, which are typically staffed by numerous individuals who reside in nearby communities"); *Castillo*, 2020 WL 1502864, at *6 ("The public has a critical interest in preventing the further spread of the coronavirus."); *Basank*, 2020 WL 1481503, at *6 ("Given the large population density of immigration detention centers and the ease of transmission of this viral pathogen, the attack rate inside these centers will take exponential proportions, consuming significant medical and financial resources.") (citation omitted); *Coronel*, 2020 WL 1487274, at *7 ("[B]oth Petitioners and the public benefit from ensuring public health and safety.").

Here, Respondents point out that Bent has two felony convictions. He was convicted in 2006 for conduct relating to a single incident for which he has served his prison sentence. The only other conviction mentioned in the record is a marijuana conviction from 1989. The court acknowledges that the 2006 conviction involved serious and violent behavior. However, there is no evidence in the record that Bent currently poses a danger to the community. Respondents have not raised any concerns about Bent's behavior in the last 14 years during his incarceration or since he has been detained. Under these circumstances, the court finds that public interest considerations weigh in favor of Bent's release under suitable conditions. Therefore, the TRO is granted, provided that Bent is able to satisfy reasonable conditions for his release.

### D. Release Conditions

Bent submitted a sworn affidavit from his brother, Doney Olivieri, who is a retired professor and lives in a home that he owns in Washington D.C. Mr. Olivieri states that he is willing to have Bent live with him and that he will ensure that Bent receives food, medical care, and other necessities. *See* Docket No. 23-3. He also represents that he is self-isolating, and that he can ensure that Bent will shelter-in-place at his home during the pandemic. *Id.* However, Bent's submissions

omit important details about his release. Specifically, Bent does not explain how he plans to travel to Washington D.C., what conditions (such as a chaperone) will mitigate the risk of Bent's flight if released to travel cross-country to his brother's house, or the exact location of his brother's residence. Therefore, by April 13, Bent shall file declarations under oath laying out a concrete proposal for release under reasonable conditions, including at a minimum his plans for transportation to Washington D.C., details regarding conditions that will mitigate the risk of flight once he is released until he reaches Mr. Olivieri's residence, and the address at which he will reside. After reviewing the declarations, the court will determine whether Bent has presented a satisfactory release plan. In a release order, the court would impose at least the following conditions:

1. Bent shall reside and shelter-in-place at the home of Mr. Olivieri, the address to be provided to the court;
2. Bent shall be transported from Mesa Verde to Mr. Olivieri's residence under conditions that address the risk of flight;
3. Bent shall be on home detention at Mr. Olivieri's house, and shall not leave the residence except to obtain medical care, to appear at immigration court proceedings, to obey any order issued by the Department of Homeland Security, or to obey a further order of this court;
4. Bent shall not violate any federal, state, or local law.

## III. CONCLUSION

For the foregoing reasons, the court conditionally grants Bent's TRO and will issue an order setting conditions of his release if Bent proposes a concrete and suitable release plan. Bent shall file declaration(s) providing the information identified above by April 13, 2020.

Respondents are ordered to show cause, no later than April 30, 2020, why the court should not issue a preliminary injunction. Bent must file a response by May 14, 2020. The matter will be deemed under submission upon receipt of the response.

15

**IT IS SO ORDERED.**

Dated: April 9, 2020

_____
Donna M. Ryu
United States Magistrate Judge